HEDERMAN *v.* COX.

(In Banc. Jan. 15, 1940. Suggestion of Error Overruled Feb. 26, 1940.)

[193 So. 19. No. 33838.]

22

Lotterhos & Travis and **Vardaman S. Dunn,** all of Jackson, for appellant.

**W. S. Henley,** of Hazlehurst, for appellee.

30

Argued orally by **Fred Lotterhos, Cecil F. Travis** and **Vardaman ·S. Dunn,** for appellant, and by **W. S. Henley,** for appellee.

**Griffith, J.,** delivered the opinion of the court.

On September 17, 1927, one Thos. E. Hand requested appellant, Hederman, to assist him in obtaining a loan of $1,577.52 at a bank. Appellant agreed to assist and offered to endorse Hand's note for that amount, but Hand stated, in effect, that his bank credit was limited and that it would therefore serve his purposes better if appellant would give him appellant's note, for the stated amount, made directly to Hand as payee, due one year after date, and that if appellant would do so Hand would give appellant Hand's note, payable to appellant for the same amount and due on the same date.

This was agreed to and was done. Hederman did not owe Hand presently or prospectively: The transaction was solely for the accommodation of Hand—there was no purpose, or supposition, that Hederman would make any use, as business paper, of Hand's note to him. Hand then took the note to the Merchant's Bank & Trust Co. of which appellee is now receiver, and Hand made a note to the bank for the stated amount, attached appellant's note thereto as collateral, and received credit for the proceeds in the full amount thereby represented. At the maturity date it was not convenient for Hand to pay it, and the debt was renewed by a new note by Hand to the bank to which was attached as collateral a new note made by Hederman to Hand, which, in turn, had been evidenced in exchange by a new note by Hand to Hederman.

This process of renewals continued down to June 7, 1932. On that date Hand desired to obtain a further re-

newal, and came to Hederman to get him to execute a new note as theretofore. Hederman had expressed to Hand some dissatisfaction about these repeated renewals, and when, on the date last mentioned, a further renewal was requested by Hand, he was told by Hederman that, because conditions were getting worse, the note would not thereafter be renewed, and at that time only until December 15, 1932. The language used by Hederman addressed to Hand at the time of this last renewal was to the effect that Hand must work out the note during the time for which it was then renewed; that Hederman would take his note as an offset, but that there would be no further renewals.

When this last note, due December 15, 1932, became due the bank urged upon Hand that it be paid, the bank calling Hand's attention to the fact that Hederman was amply solvent and able to pay. Up to that time the bank had been under the impression that appellant's several renewal notes to Hand had been for an insurance premium, Hand being in that business; but when on or about the date last mentioned the bank urged that Hand collect the note from Hederman and turn the proceeds into the bank, Hand, for the first time, informed the bank that Hederman was not indebted to Hand, that Hederman had executed the note for Hand's accommodation and that Hand was in no position to call on Hederman for its payment. And inasmuch as Hederman had positively stated to Hand that he would not further renew it, Hand was in no position to call on Hederman for such a renewal.

In that situation, and with that knowledge, the bank, nevertheless, renewed the principal debt by taking a new note from Hand, date December 15, 1932, and due on January 15, 1933, and again renewed it on or about January 15, 1933, by a new note from Hand to the bank, due June 15, 1933, annexing to each of these renewal notes, as collateral, the last note of Hederman, past due since December 15, 1932.

In April, 1933, the bank closed its doors and went into liquidation. It was some considerable time thereafter, the exact time not being disclosed by the record, when Hederman learned that the bank was still holding his note; and when so learning, he went to the office of the receiver to inquire why he had not been earlier informed, and he was told by the force there in charge that they had been instructed not to advise him about the note at all. Appellant thereupon denied liability on the ground that the note was an accommodation note and had been extended by the bank by a binding extension agreement with the accommodated party, without the knowledge or consent of the accommodation maker, after the bank had acquired knowledge of the actual character of the paper; and in point of fact the undisputed proof sustains the contention.

There may be added that it is shown by an agreed statement of facts that in December, 1932, Hand was employed as vice-president of a local life insurance company at a good salary; that his employment terminated in April 1935, and that he removed to Louisville, Kentucky, where he filed a voluntary petition in bankruptcy in November 1936, the estate paying no dividends to common creditors; that at the time of the closing of the appellee bank, Hand was indebted to it in the sum of approximately $20,000, of which the larger part has never been recovered.

On July 22, 1937, Hederman filed his bill seeking a cancellation of his note, dated June 7, 1932, as aforesaid, and for the reasons already mentioned, to which the receiver for the bank responded with a cross-bill. Upon the hearing the cross-bill was sustained and a decree was rendered against Hederman for the full amount of the note together with interest and attorneys' fees.

It has been noted in the statement of the facts that the bank did not buy the Hederman note outright, relying solely on that note, but took it as collateral to a note contemporaneously made by Hand to the bank. And had

Hederman's note been in the course of an ordinary business transaction in which that note to Hand had rested upon an independent obligation, or upon an independent transaction, between Hederman and Hand, the bank would have taken it as a holder for value freed of any defenses between the maker and the payee; and the fact that the bank extended Hand's note to the bank by renewal or otherwise would not have affected the rights of the bank to hold the maker of the collateral note. First Nat. Bank of Iowa City v. John McGrath & Sons Co., 111 Miss. 872, 72 So. 701.

But the consideration of the principal note of Hand to the bank and that of Hederman to Hand, deposited as collateral in order to procure the loan for Hand, was the same; that is to say, there was no distinct consideration resting upon transactions actually separate in purpose and import. The purpose of the Hederman note and its consideration was to obtain the loan for Hand—there was no other or independent consideration. Thus the principal question before us is whether the treatment of a note solely for accommodation, and whether taken directly or by way of collateral, must command a different approach from that of ordinary notes or bills of exchange executed in the usual course of business, each upon its own independent obligation.

When a person lends his credit to another solely for the accommodation of the latter, the accommodation party may, in view of the present circumstances of the party accommodated and the present outlook of things, be willing to do so for or during a reasonably short time or for any other time agreed upon, but unwilling to make that time any longer. And, as already shown by the statement of the facts, this is exactly the case we have here. The reasons for the stated caution in the risks of the daily lives of men are obvious. Hence the pertinency of the language used by this Court in Rylee v. Wilkerson, 134 Miss. 663, 669, 99 So. 901, 902: "The purpose and object in making or indorsing a note for the accommoda-

tion of another—'is to obtain credit for such other, or to enable him to do so. The very terms of the note declare the credit it is intended to procure, that is to say, until the maturity of the note. Within that range, the making or indorsement being unrestricted as to its use, the borrower may use it as his exigencies require, and a transferee may receive it in reliance upon the undertaking which is imported by its terms. But the very term of payment, contained in the note, imports that the accommodation party undertakes that the note shall be paid at its maturity; and that he who then holds the note, shall have recourse to him, if it be not then paid. . . . And accordingly, when such accommodation is given, it is a most material circumstance that the time during which the borrower is at liberty to obtain credit on the note is fixed by the limitation of the time of payment therein.' . . . 'When a man lends the use of his name to another by signing a bill or note payable at a certain time, it seems in accord with common sense to interpret the fixing of a definite time for payment as meaning an intention to limit the use of the name for the time mentioned in the instrument.' ''

The effect of this language is, in consideration of the equities of the circumstances under which accommodation paper is given, to consider the time fixed as the due date of the paper as being of the essence of the instrument: that the time during which credit may be extended upon an accommodation note is up to and not beyond the date of its maturity—that the giving of credit on the strength of the note shall not be extended beyond that time.

It was, therefore, held by the court, although taking notice of some of the apparently contradictory provisions of the Uniform Negotiable Instruments Law, Chap. 51, Code 1930, that a purchaser of an accommodation note after its maturity could not recover thereon against the accommodation maker.

What is the difference, then, when the holder of an

accommodation note, knowing it to be such, and without the knowledge or consent of the maker, by a binding agreement with the partly accommodated, extends the time of payment beyond the maturity date of the note? What is the difference between this, so far as the rights of the accommodation maker are concerned, than if the holder had altered the note by inserting a new and a different due date therein? The accommodation maker says, and says in writing, by his accommodation note that he is willing to extend his credit during the time therein mentioned, and no longer, yet the holder knowing of the actual character of the paper seeks to change his engagement without his consent, and nevertheless to hold him under the enlarged set-up, as fully as if he had consented to the change—to which we reply that it cannot be done.

If it could be done, the holder could indulge the accommodated party by repeated binding extensions, keeping the accommodation party in ignorance thereof, or with his hands tied if he had found it out, and when the party accommodated had become, or about to become, insolvent or bankrupt then, for the first time, call on the accommodation party for payment—and that is about what happened here—whereas if performance had been required by the holder on the maturity date, the maker could or might have then have saved himself by recourse upon the accommodated party.

That a maker, endorser or acceptor of an accommodation note or bill purely for the accommodation of another is a surety, although liable on the paper according to its tenor, has long been a settled rule in this State, Smith v. Clopton, 48 Miss. 66; Meggett v. Baum, 57 Miss. 22; and the attitude of our jurisprudence towards gratuitous sureties has been reaffirmed in one of our latest cases, Raleigh Co. v. Rotenberry, 174 Miss. 319, 324, 164 So. 5 in this language: "A gratuitous surety is a favorite of the law and the contract must be strictly construed to impose upon the surety only the burdens clearly within

the terms of the contract, so that it cannot be extended by implication, presumption, or construction.'' A fortiori it cannot be extended by imposing thereon a new and a different date for performance by the principal to the hurt or possible hurt of the surety—the obligation of the surety must not be extended to any other period of time than is expressed or necessarily included in the contract itself. 21 R. C. L., p. 977.

Those principles are not, in general, disputed; but it is said that as to bill and notes the rules have been altered by the Uniform Negotiable Instruments Law, and particularly by Secs. 119 and 192, our Secs. 2775 and 2848, Code 1930. As already indicated, we cannot agree to this contention.

The purposes in the enactment of the Uniform Negotiable Instruments Act were to promote readiness and confidence in the negotiation of commercial paper, and, as its title denotes, to contribute to a general uniformity among the several states in the law governing such transactions. And many of the courts in what, as we think has been an over-zealous effort at uniformity have given to the act such a literal construction as would entirely exclude the rules, worked out through long years of constructive jurisprudence, applicable to the relationship of principal and surety.

But the rules respecting the relationship of principal and surety in the matter of accommodation paper were already of a general uniformity throughout the states, as we believe, and we do not believe it was ever contemplated by our own legislature that, by assenting to the Act, these rules as regards that character of paper would be abrogated in this State, there being no occasion or necessity whatever therefor. Under the Act the person to whom a negotiable instrument is offered may take it and rely on it for what it appears to be on its face, even though he knows that it was made solely for accommodation; but no real or substantial object is served towards the purposes of the Act in not requiring that the holder

·shall deal with it according the rights of the accommodation maker as those rights appear on the face of the paper, when and after the taker or holder has knowledge of the character of the paper as being accommodation paper.

. Recurring, ˙therefore, to the considerations already mentioned, that an accommodation maker may be willing to extend his credit for the time mentioned in the paper, that is to say, during and up to the time of the maturity of the paper as expressly written on the face thereof, and no further, it detracts nothing from the force or validity of it, or from its real value when taken as security, that the holder who knows its actual character shall proceed upon it with due regard to that character, and with like regard to the interests of the maker or endorser—that those interests shall not be jeopardized or sacrificed by handling of the paper otherwise than the paper stipulates on its face. And, we repeat that when the holder of accommodation paper extends the time of its payment by a binding agreement with the accommodated party without the knowledge or consent of the maker or endorser, the holder knowing the actual character of the paper at the time of the extension, there is thereby sought to be imposed upon the maker or endorser a liability beyond that which was undertaken by the maker or endorser, and beyond that which he would have been willing to undertake—which ought to let in, and which we hold does let in, the rule as respects principal and surety by which the surety is discharged.

By the general reference which we have already made it is to be observed that we have not failed to consider the impressive line of cases in other jurisdictions annotated in 48 A. L. R. 715, and 65 A. L. R. 1425, such as Union Trust Co. v. McGinty, 212 Mass. 205, 98 N. E. 679, Ann. Cas. ·1913C, 525, which maintain that a note such as we have here can be discharged only in one of the five ways mentioned in Sec. 119 N. I. L., our Sec. 2775, Code 1930. We must nevertheless follow the reasoning

of our own cases, among which are to be noted Gilliam v. McLemore, 141 Miss. 253, 106 So. 99, 43 A. L. R. 79 and First Nat. Bank of Gulfport v. Rau, 146 Miss. 520, 112 So. 688 (and see Industrial Loan & Inv. Co. v. Miller, 163 Miss. 288, 141 So. 587), and the philosophy of our own jurisprudence; and in doing so we have the company at least, of some other courts and of text writers and commentators, as may be gathered from Brannon's Negotiable Instruments Law (4 Ed.), p. 723, and see especially the recent scholarly treatise, 4 Williston on Contracts, Revised Ed. 1936, Secs. 1259 and 1260.

Appellee contends, however, that Hederman was not an accommodation party at all, but that his receipt of the exchanged note from Hand makes him, as to his note to Hand, a maker for a valuable consideration. Undoubtedly, it is well settled that exchanged notes, commonly called cross notes, though made for the accommodation of the parties, are not accommodation, but business paper, when it is the intention of the parties that each of them shall make use of the note taken by him as ordinary business paper is used; for in such case one note is a valuable consideration for the other—one in such case may be regarded as the purchase price of the other.

But in the exchange of notes, whether one is to be regarded as a consideration for the other, as if a purchase, is a question of the intention of the parties thereto, and this intention may be found in express words used by them, or in the implications of the entire set of the circumstances surrounding the making of the paper. If, therefore, the transaction be in fact for the accommodation of one of the parties, and it is the understanding between them that the accommodation party shall take the paper given him not for the purpose of unrestricted use by him, but only in the nature of written evidence of the transaction and as an offset or as security in case, and only in case the accommodation party shall be lawfully called upon to pay the accommodation note, the paper remains accommodation paper, regardless of the techni-

cal form of the transaction. In this, as in many other cases, courts must look at transactions in their actual character, piercing through the screen of technical attitudes to what are the realities, and must regard substance rather than formal similitudes.

Sufficient of the authorities upon the subject dealt with in the two foregoing paragraphs are to be found in the annotations in 7 A. L. R., pp. 1569 to 1573. . Owing to the length to which this opinion has already progressed, we cannot elaborate upon the evidence, which is undisputed, in respect to the several conversations between Hand and Hederman and the details of the attendant circumstances in the making of these notes; but must content ourselves with the statement of our conclusion, upon a mature study of the evidence taken from its four corners, that the Hederman note here sued on by the bank falls within the rule as stated in the next preceding paragraph of this opinion.

Finally, the argument is made that because Hederman sent Hand's note to him to Louisville, for suit, and there filed it in Hand's bankruptcy proceeding Hederman should be treated as having elected to consider it as his own note, founded upon a valuable consideration as between him and Hand. Nothing was said in the pleadings about this, and it seems not to have been fully developed in the evidence. But there is enough in the evidence to disclose that this action was taken by Hederman in accordance with several conversations with the receiver of the bank some time after the bank closed its doors, in which the understanding was had between them that Hederman would make such collections as he could from Hand, and pay the same to the bank, but without thereby admitting or being committed to any further liability than those collections. One hundred and fifty dollars were so collected, which amount Hederman states, in response to the argument, he is holding for the bank and to be paid to the receiver whenever he is willing to accept it. The facts, therefore, do not sustain the ar-

gument made by the bank, although the bank is entitled to receive the $150, and the decree herein will be without prejudice to that right.

Reversed, and decree here.

SPECIALLY CONCURRING OPINION.

**Smith, C. J.,** delivered a specially concurring opinion.

I do not disagree with the opinion in chief, nor with the conclusion therein reached, but I suggest that our judgment might well be rested on another ground. The appellant was not a party to the note executed by Hand to the Bank. What here occurred was that the appellant executed a note, payable to Hand, without consideration therefor. He delivered the note to Hand, not for the purpose of vesting title thereto in him, but merely for the purpose of enabling him to pledge it to the Bank as collateral to secure the payment of a note to be executed by Hand to the Bank, all of which was known to the Bank when it extended Hand's note without the appellant's consent. This being true, the appellant's liability to the Bank is not governed by the law of negotiable instruments, but by the law of pledges, 9 C. J. S., Banks and Banking, section 389, par. c, and is that of a surety for Hand. It is well settled that "a person pledging his property as security for the payment of the debt of another stands in the position of a surety of the debtor, and any change in the contract of the principal which would discharge the surety would operate to release and discharge the property so held as collateral." Jones on Collateral Securities (3 Ed.), Sec. 517(a); 49 C. J. 932; 1 Brandt Suretyship & Guaranty (3 Ed.), Sec. 42.

This rule applies to property of any kind, including promissory notes, which species of property is the kind usually pledged as collateral security. That a creditor who extends the payment of a debt without the consent of the surety therefor releases the surety from any further

obligation to pay the debt is too well settled to require the citation of authority therefor.

DISSENTING OPINION.

**Anderson, J.,** delivered a dissenting opinion.

One of the outstanding purposes of the Negotiable Instruments Act was to promote the negotiability of commercial paper in the hands of holders in due course. The Act provides (Sec. 2716, Code of 1930) that: "A holder in due course holds the instrument free from any defect of title of prior parties, *and free from defenses available to prior parties among themselves* [italics mine], and may enforce payment of the instrument for the full amount thereof against all parties liable thereon."

A holder in due course is defined by Section 2708, as one who has taken the instrument under the conditions that it is complete and regular upon its face; that he became a holder before it was overdue, and without notice that it had been previously dishonored, if such was the fact; that he took it in good faith and for value; and that at the time it was negotiated, he had no notice of any infirmity or defect in the title of the person negotiating it.

Section 2775 of the Act provides how a negotiable instrument may be discharged; that it may be done in any one of five methods, namely, by payment in due course, by and on behalf of the principal debtor; by payment in due course by the party accommodated, where the instrument is made or accepted for accommodation; by the intentional cancellation thereof by the holder; by any other act which will discharge a simple contract for the payment of money; and when the principal debtor becomes the holder of the instrument at or after maturity in his own right.

Section 2776 of the Act provides, among other things, that where, under the terms of the instrument, one of the parties thereto is only secondarily liable, he is discharged by any agreement binding upon the holder to

extend the time of payment or postpone the holder's right to enforce the instrument, unless made with the assent of such party, or unless the right of recourse against such party is expressly reserved.

I do not understand the majority opinion to mean that if Hand and Hederman had been joint makers of the note to the bank, binding themselves jointly and severally, to pay the debt, although as between them Hederman was an accommodation maker, an extension of time of payment by a binding agreement between the bank and Hand would release Hederman. Certainly, under the plain provisions of the Act, it would not. No decisions to the contrary construing the Negotiable Instruments Act are referred to, and I do not believe there are any. Furthermore, where, on the face of the instrument, the parties have become jointly and severally liable, a holder in due course has the right to rely thereon although he may know that one of them has received no part of the consideration and is only an accommodation maker. In order for an accommodation maker to be entitled to his rights as such, he must appear on the instrument in that capacity and not as a joint maker. Putting it differently. when a negotiable instrument goes out into the channels of trade and commerce, a holder in due course has the right to stand on its terms. If the signers appear to have bound themselves jointly and severally, they cannot escape liability in that capacity although the holder knows when he acquires the instrument that one of them is merely an accommodation maker.

It is true that Hand and Hederman did not execute the same note to the bank. Instead, they executed separate notes for the amount of money Hand borrowed from the bank. Hand gave his note for the amount payable directly to the bank, while Hederman gave his note payable to Hand, which he transferred to the bank. In other words, for the repayment of the loan to Hand the bank held two notes, Hand's and Hederman's, both of which were direct obligations to pay the bank. There was noth-

ing on the face of either instrument to show that Hederman's note was only accommodation paper. Both parties were primarily liable. Now, what is the difference under the statute between two such notes and one joint note? I am unable to see any so far as the question here involved is concerned. To hold that Hederman as a joint maker of the note with Hand would not have been released by an extension of time granted the latter, but that such an extension would release Hederman from liability if their obligation to the bank was in separate notes would be irreconcilable principles of law. It is true that the facts would be different, but, under the law, they would mean the same thing.

There are no decisions of our Court construing the Negotiable Instruments Act that hold to the contrary. Gilliam v. McLemore, 141 Miss. 253, 106 So. 99, 43 A. L. R. 79; and First Nat. Bank of Gulfport v. Rau, 146 Miss. 520, 112 So. 688, are not in point. On the other hand, there is ample authority, supporting this dissent. See Union Trust Company v. McGinty, 212 Mass. 205, 98 N. E. 679, Ann. Cas. 1913C, 525, and cases annotated in 48 A. L. R. 715, and 65 A. L. R. 1425.